**EXHIBIT "A"**

**SUM-100**

# SUMMONS
ON FIRST AMENDED
*(CITACION JUDICIAL)* COMPLAINT

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

1169 HILLCREST, LLC, a Nevada limited liability corporation;
Additional Parties Attachment form is attached.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

PALUMBO DESIGN, LLC, a California limited liability corporation,

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have **30 CALENDAR DAYS** after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Los Angeles Superior Court - Central

111 N. Hill Street, Los Angeles, CA 90012

**CASE NUMBER:**
*(Número del Caso):*

19STCV18838

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Laurence M. Berman, 815 Moraga Drive, Los Angeles, CA, 90045, 424-465-9079

Sherri R. Carter Executive Officer / Clerk of Court

**DATE:** 06/21/2019
*(Fecha)*

Clerk, by Veronica Delgadillo , Deputy
*(Secretario)* *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)

   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Palumbo Design LLC v. 1169 Hillcrest, et al. | 19STCV18838 |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff   ☑ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

NEM 2 LLC, a Nevada limited liability corporation fka NAM 2 LLC, Neil Moffitt, an individual, and DOES 1 through 10, inclusive,

Page __2__ of __2__

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

**Berman Litigation Group**
Laurence M. Berman (SBN 93515)
815 Moraga Drive
Los Angeles, CA 90049
Phone No.: (424) 465-9079
Fax No.: (310) 454-0868
Email: lberman@bermanlitigationgroup.com

**Baake Law LLC**
David R. Baake (SBN 325087)
275 Downtown Mall
Las Cruces, NM 88001
Phone: (545) 343-2782
Email: david@baakelaw.com

*Attorneys For Plaintiff Palumbo Design, LLC*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

| | |
|---|---|
| PALUMBO DESIGN, LLC, a California limited liability corporation,<br><br>    Plaintiff,<br><br>    vs.<br><br>1169 HILLCREST, LLC, a Nevada limited liability corporation, NEM 2 LLC, a Nevada limited liability corporation fka NAM 2, NEIL MOFFITT, an individual, and DOES 1 through 10, inclusive,<br><br>    Defendants. | Case No.: 19STCV18838<br>*Assigned for all purposes to the Hon. Michael Linfield, Dept. 34*<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) BREACH OF CONTRACT; AND**<br>**(2) QUANTUM MERUIT** |

Plaintiff Palumbo Design, LLC, by and through its attorneys, brings this action against Defendant 1169 Hillcrest, LLC, a Nevada limited liability corporation, Defendant NEM 2 LLC, a Nevada limited liability corporation fka NAM 2 LLC, Defendant Neil Moffitt, an individual, and Does 1 through 10.

## **PARTIES**

1. Plaintiff Palumbo Design, LLC ("Palumbo Design" or "Plaintiff") is, and at all times relevant hereto was, a California limited liability company having its principal place of business in the County of Los Angeles, California.

2. Plaintiff is informed and believes, and based thereon alleges, that Defendant 1169 Hillcrest, LLC ("1169 Hillcrest"), is a limited liability company organized and existing pursuant to the laws of the State of Nevada, having its principal place of business in the County of Los Angeles, State of California.

3. Plaintiff is informed and believes, and based thereon alleges, that Defendant Neil A. Moffitt ("Moffitt") is the manager of 1169 Hillcrest.

4. Plaintiff is informed and believes, and based thereon alleges, that the only member of 1169 Hillcrest is Defendant NEM 2 LLC ("NEM 2") or NAM 2 LLC ("NAM 2"), both of which are limited liability companies organized and existing pursuant to the laws of the State of Nevada, and having their principal place of business in the state of Nevada. (NEM 2 and NAM 2 shall be collectively referred to as "NEM 2.").

5. According to NEM 2's most recent Annual List of Managers and State Business License Application filed with the Nevada Secretary of State, Moffitt is the sole member/manager of NEM 2, and Moffitt is based at 5731 Lago Lindo, P.O. Box 2487, Rancho Santa Fe, California. Defendants Moffitt, 1169 Hillcrest, and NEM 2 LLC shall be collectively referred to as Defendants.

6. This lawsuit arises from a Development Services Agreement ("DSA") that was entered into on March of 2014 between Plaintiff and 1169 Hillcrest for a property located at 1169 North Hillcrest Road in Beverly Hills, California (the "Property"). Under the DSA, Plaintiff was entitled to 40% of the Aggregate Development Fee upon the sale of the

- 1 -

Property. Although an Aggregate Development Fee has been earned, Defendants have failed to pay Plaintiff its share of the fee, and continue to refuse to do so despite repeated demands by Plaintiff. On information and belief, the monies owed to Plaintiff under the DSA were paid or transferred to 1169 Hillcrest, NEM 2 and/or Moffitt.

7. On information and belief, 1169 Hillcrest has a single member—NEM 2 —and NEM 2 in turn has a single member—Moffitt. Single member LLCs are "disregarded entities" for federal and state income tax purposes, and the single member is deemed to be the seller of the property for income tax purposes. This means that the single members, Moffitt and NEM 2, are deemed to be the sellers of the Property for income tax purposes. On information and belief, certain of the funds owed to Plaintiff were used to pay off Moffitt's personal tax liabilities.

8.  By virtue of Defendants 1169 Hillcrest, NEM 2, and Moffitt's wrongful retention of Plaintiff's share of the monies owed to Plaintiff under the DSA, Plaintiff is entitled to an order declaring that Defendants 1169 Hillcrest, NEM 2, and Moffitt hold said funds and any proceeds thereof and any other property acquired therewith as a constructive trustee for the benefit of Plaintiff, and should be compelled to convey these funds and any profits earned from these funds to Plaintiff.

9. Plaintiff is ignorant of the true names and capacities of Defendants fictitiously designated herein as Does 1 through 10, inclusive, and therefore sues those Defendants by such fictitious names. Plaintiff will seek leave of Court to amend this complaint when the true names and capacities of such fictitiously designated Defendants have been ascertained. Plaintiff is informed and believes and based thereon alleges that each fictitiously designated Defendant in some way as yet unknown to the Plaintiff is and was in some manner responsible for, or a party to, the disputes and other acts alleged herein.

10. Plaintiff is informed and believes and thereon alleges that each Defendant sued herein was the agent, principal, employee or representative of the other Defendants herein, participated in and/or ratified the acts complained of herein, provided knowing and substantial assistance to the other Defendants, or are in some way liable for the actions of

- 2 -

each of the other defendants.

## JURISDICTION AND VENUE

11. Plaintiff is a resident of the County of Los Angeles, State of California. Defendant 1169 Hillcrest is a resident of the County of Los Angeles, State of California.

12. This Complaint asserts Plaintiff's rights under the DSA. The DSA was entered into and performed in the County of Los Angeles, and the acts that provide a basis for the claims asserted in this complaint took place in Los Angeles County. Defendants purposefully availed themselves of the privilege of conducting business in California; each of the causes of action set forth in this Complaint arise under California law. Accordingly, this Court has jurisdiction over this matter pursuant to, *inter alia*, Section 410.10 of the California Code of Civil Procedure and Section 10 of Article VI of the California Constitution.

13. Venue is proper in Los Angeles County because Plaintiff is informed and believes, and thereon alleges, that Defendant 1169 Hillcrest contracted to perform certain obligations in Los Angeles County under the DSA. Accordingly, venue is proper in Los Angeles County under Section 395 of the California Code of Civil Procedure.

## FACTUAL BACKGROUND

### The 1169 Hillcrest Property

14. Michael Palumbo is a well-known home designer and developer who has specialized in locating, designing, and building homes in Beverly Hills, Holmby Hills, Bel Air, and Hollywood Hills for over thirty-five years. He conducts business through Palumbo Design LLC.[1]

15. In 2013, Mr. Palumbo identified a lucrative real estate development opportunity to develop the Property. In early 2014, Mr. Palumbo entered into the Residential Purchase Agreement and Joint Escrow Instructions to purchase the Property for $15,000,000.

16. Before the close of escrow for the Property, Mr. Palumbo was approached in

---

[1] For simplicity, "Palumbo" will be used to refer to the LLC, while "Michael Palumbo" or "Mr. Palumbo" will be used to refer to the individual.

California by Moffitt about the Property.  Moffitt represented to Mr. Palumbo that he wanted to purchase the Property from Mr. Palumbo and, together with Mr. Palumbo, construct "an elite high-end residence," sell it, and split the profits. The developed Property is hereinafter referred to as the "Project."

17. On February 4, 2014 Michael Palumbo and Moffitt entered into a Memorandum of Understanding ("MoU") to memorialize their mutual understanding regarding how to develop the Property.  Under the MoU, Michael Palumbo would transfer all his interests in the Property to Moffitt in exchange for Moffitt's promise to form a new limited liability company (the "Operating LLC") that would own and manage the Property to "develop and sell an uber high end caliber home" upon close of escrow.

18. Moffitt told Palumbo Design to expect a draft operating agreement for the Operating LLC shortly. But, on or around March 14, 2014, Michael Palumbo was surprised to receive a proposed Development Services Agreement instead.

19. This new agreement proposed a radically different relationship between Palumbo Design and the Operating LLC.

20. The MoU contemplated that Palumbo Design and an entity controlled by Moffitt would be co-members of the Operating LLC. Now, after reviewing the DSA (and without any warning from Moffitt that this new structure was being proposed), Palumbo understood that Moffitt was offering to have the Operating LLC *employ* Palumbo Design as an *independent contractor*.

21. Palumbo Design was further surprised to learn that Moffitt intended the Operating LLC (to be known as 1169 Hillcrest, LLC) to have only *one* member—NEM 2. Since NEM 2 is an entity controlled by Moffitt himself, Moffitt alone would enjoy membership rights in the Operating LLC.

22. Although the parties had initially discussed a relationship in which Palumbo would have an equity interest in 1169 Hillcrest LLC, the DSA Moffitt presented to Palumbo provided instead that the parties would receive a share of the profits upon the sale of the Property. The parties executed this agreement—the DSA—in March 2014. A copy of the

- 4 -

DSA is attached as Exhibit 1 to this Complaint.

23. Section 2.1 of the DSA provided that Palumbo would be appointed "to manage and oversee the planning, approvals, programming, permitting, construction, and development of the Project . . . ."

24. Section 5.1 of the DSA provides that Palumbo will be paid a fee, to be calculated in accordance with Schedule 5.1. Schedule 5.1, in turn, provides:

SCHEDULE 5.1 Development Services Fee

1.  Commencing 30 days after Owner's purchase of the Property, the Owner shall pay a monthly draw in the amount of $15,000.00 per month to Palumbo (the "Monthly Draw"). The Monthly Draw shall continue until the cumulative Monthly Draws equal seven percent (7%) of the construction cost of the Project or until the sale of the Project and/or Property, whichever shall first occur. All Monthly Draws will be an advance of the aggregate development fee (the "Aggregate Development Fee").

2.  The Aggregate Development Fee shall be calculated as follows:

The Sales Price of the Project and/or Property

Less real estate broker Commission

Less out-of-pocket costs of sale of the Project and/or Property incurred by Owner

Less all cash payments made by the Owner to purchase, develop and construct the Project and/or Property (the "Owner Payments")

Less a preferential return of 10% on all Owner Payments

Less all payments of principal and interest in the event that Owner determines to obtain financing for the purchase, development and construction of the Project and/or Property, including all costs incurred by Owner in connection with obtaining such financing(s)

Equals Net Profits on sale of the Project and/or Property.

The Aggregate Development Fee shall be 40% of the Net Profits on Sale of the Project and/or Property.

The amount to be paid to Palumbo upon the sale of the Project and/or Property shall be:

The Aggregate Development Fee less the aggregate of all Monthly Draws upon the sale of the Project and/or Property.

25. Palumbo is entitled to a 'Development Service Fee' as defined by Section 5.1 of

- 5 -

the DSA, upon the sale of the Property by 1169 Hillcrest to any other party, including Palumbo.  The DSA specifically contemplates that the Development Services Fee will be paid *whether or not the Project is completed*, insofar as it provides that the fee shall be calculated based on "[t]he Sales Price of the Project *and/or* Property."  Thus, even if 1169 Hillcrest decided to sell the Property in an undeveloped state and terminate Palumbo's appointment to oversee development, Palumbo would still be entitled to its share of the proceeds.

26. The issue of when Palumbo's contractual rights arose under the DSA was the subject of a December 7, 2016 ruling by the United States District Court in the forfeiture proceedings against the Property. In response to a motion filed by Defendants, in the forfeiture proceedings that Court held: "Under the contract between Palumbo and 1169 Hillcrest, Palumbo was to be paid *after* the sale of the Property. The *sale* did not occur prior to the filing of this forfeiture action."

27. Section 8.1 of the DSA, entitled "Termination," provides that Palumbo's Appointment to oversee the Project may be terminated if, *inter alia*, 1169 Hillcrest LLC "giv[es] Palumbo written notice" that "the Project and/or the Property is sold by the owner." Section 8.3, entitled "Compensation of Palumbo on Termination," provides, in relevant part:

> If Palumbo's appointment under this Agreement is terminated under Section 8.1, within 60 days after such termination, the Owner shall pay to Palumbo all amounts earned by (in accordance with Section 5.1) and owing to Palumbo under this Agreement (including any amount owing under Section 5.1), calculated *as of the date of termination,* including the Aggregate Development Fee less the aggregate of all Monthly Draws in the event this Agreement is terminated due to a sale of the Project and/or the Property.

28. Putting these provisions of the DSA together, the DSA provides that (1) 1169 Hillcrest LLC is required to pay Palumbo his share of the profits *after the Property is sold* but (2) Palumbo's right to receive Monthly Draws, and 1169 Hillcrest's right to receive a preferential return on its investment in the Property, terminate as of the date that Palumbo's appointment as manager and developer is terminated.

//

- 6 -

**1169 Hillcrest Terminates Palumbo's Appointment Under the DSA.**

27. On February 10, 2015, Moffitt sent Palumbo an email in which he terminated the Development Project, allegedly because Khadem Abdulla Al Qubaisi ("KAQ") was "disenchanted" with Palumbo.  Moffitt's stated grounds for terminating the Development Project were a pretext to terminate Palumbo's role and sell the Property in its undeveloped state to a third party, Skyview Capital ("Skyview"). This is clear from the following facts:

    a.  On January 5, 2015, Skyview made its initial offer of $22 million to purchase the Property.

    b.  On February 9, 2015, Moffitt had NEM 2 LLC, an entity wholly owned by him, purchase KAQ's interest in 1169 Hillcrest for $16.3 million.

    c.  On February 10, 2015, a day later, Moffitt terminated the Development Project and Palumbo's appointment under it.

    d.  On February 13, 2015, Moffitt's wholly owned entity, NEM 2 and Skyview finalized the "Vacant Land Purchase Agreement" pursuant to which the Property would be transferred to Skyview.

***Palumbo I* and the Settlement Agreement.**

28.    After Moffitt terminated Palumbo's appointment under the DSA, Palumbo sued 1169 Hillcrest and Moffitt in United States District Court. [*Palumbo I*] In the operative complaint, Palumbo asserted fraud in the inducement as his primary claim and sought rescission of the DSA.  In the alternative, Palumbo asserted claims for breach of contract, breach of the implied covenant of good faith, and unfair business practices.  (Palumbo did *not* assert that he was entitled to the Aggregate Development Fee.  Indeed, it would not have been possible for Palumbo to recover that fee, because the proposed sale of the Property had not yet closed—a fact that is clear from the face of the operative complaint.  ["The sale of the Property, *if consummated*, will be at a sales price that is at least $6 million less than the current market value of the Property . . . ."] [emphasis added].)

29.    Palumbo also filed a Lis Pendens in *Palumbo I.*  1169 Hillcrest filed a Motion to Expunge the Lis Pendens, arguing that Palumbo did not have an interest in the Property

- 7 -

because it "assigned the rights to purchase and develop the Property, in exchange for forty percent (40%) of the net *profits* on the eventual sale of the developed Property." The Court granted the motion, after determining that Palumbo did not have an interest in the Property.

30.     After this ruling, Palumbo and 1169 Hillcrest, Moffitt, and NEM 2 entered into a Settlement Agreement. This agreement provided that Palumbo would dismiss *Palumbo I* with prejudice in exchange for 1169 Hillcrest's agreement that allowed Palumbo to market and purchase the Property for a limited period of time. A copy of the Settlement Agreement is attached as Exhibit 2 to this Complaint.

31.     The Settlement Agreement specifically preserved Palumbo's right to bring an action such as this one. Section 2 provides (a) that the DSA is valid and enforceable; (b) that "Palumbo is entitled to a 'Development Services Fee,' as defined in Schedule 5.1 of the DSA, upon the sale of the Property by 1169 Hillcrest, LLC to any other party"; and (c) "an action to resolve any prospective dispute over the meaning and interpretation of the DSA *is not barred* by this Agreement." (Ex. 3 at pp. 2-3 [emphasis added].) In addition, Section 1(h) provides: "This release . . . does not effect [sic] any new conduct that would constitute a breach of the DSA after the execution of this Agreement."

32.     The Settlement Agreement incorporated the venue and choice of law provisions of the DSA. This means an action based on the Settlement Agreement must be decided by a California court located in Los Angeles County, who will apply California law.

33.     Pursuant to the Settlement Agreement, *Palumbo I* was dismissed with prejudice on December 15, 2015.

### The Skyview Federal Court Action and Soltani Release.

34.     While *Palumbo I* was pending, Skyview filed a separate action in state court against 1169 Hillcrest and NEM 2 seeking to enforce the Vacant Land Purchase Agreement. NEM 2 availed itself of California courts by removing that action to United States District Court. NEM 2 did not contest this Court had jurisdiction over it in the Skyview action. Moffitt, 1169 Hillcrest, NEM 2, Skyview, Alex Soltani (Skyview's owner), Palumbo

- 8 -

Design, and Palumbo then entered mediation. This produced a settlement referred to as the Soltani Release.  The Soltani Release sets forth three separate releases: (1) a release of Skyview and Soltani by Moffitt, NEM 2, and 1169 Hillcrest (2) a release of Skyview and Soltani by Palumbo and Palumbo Design, and (3) a release of Moffitt, NEM 2, 1169 Hillcrest, Palumbo Design, and Palumbo by Skyview. The Soltani Release does not contain a release of Moffitt, NEM 2 LLC, or 1169 Hillcrest by Palumbo. The Soltani Release was entered into by Moffitt, in his individual capacity, and by NEM 2. The Soltani Release contains a California choice of law provision.

**The Hilton & Hyland Action Against Moffitt, NEM 2 LLC and 1169 Hillcrest LLC in California State Court.**

35.    On February 18, 2016, Hilton & Hyland Real Estate, Inc. ("Hilton & Hyland") sued Moffitt, NEM 2, and 1169 Hillcrest in state court in California seeking to recover a real estate commission owed to Hilton & Hyland from the sale of the Property. Moffitt and NEM 2 appeared in the action and did not contest the court's exercise of jurisdiction over them. NEM 2 filed a Cross-Complaint in this action.

**The Government's Forfeiture Complaint and Moffitt's Claim that He Is Entitled to All of the Net Proceeds from the Sale of the Property.**

36.    On July 20, 2016, the Government filed civil forfeiture complaints against numerous properties, including 1169 North Hillcrest Road. On August 12, 2016, the Government and 1169 Hillcrest entered into a stipulation whereby 1169 Hillcrest would sell the Property for a minimum of $23 million, and the Government would lift its lis pendens against the property and accept the net proceeds of the sale as substitute res.

37.    Moffitt filed a claim in the forfeiture action in which he asserted an ownership interest in the Property. Palumbo also filed a claim on September 8, 2016. Palumbo's claim asserted an interest in "40% of the profits of any sale of the Property."

38.    1169 Hillcrest filed a motion to strike Palumbo's claim for lack of standing. The Court granted the motion.  The Court explained that Palumbo had a contractual interest in the proceeds of any sale of the Property, but did not have an interest in the Property

- 9 -

itself:

> Fundamentally, Palumbo is owed payment for its services by 1169 Hillcrest. That amount is calculated based on the sale price of the Property less certain enumerated costs of developing the Property. [Citation omitted]. This is not a claim against the Property; it is a claim for payment from 1169 Hillcrest that happens to be related to the value of the Property.

> There is no indication that anyone is wrongfully detaining money owed to Palumbo at this time. *Under the contract between Palumbo and 1169 Hillcrest, Palumbo was to be paid after the sale of the Property. The sale did not occur prior to the filing of this forfeiture action. . . .* The Property and the proceeds of sale of the Property are necessarily detained pending resolution of this action by the operation of the civil forfeiture statutes and rules. Palumbo might, at best, be entitled to a constructive trust over profits derived from sale of the Property if 1169 Hillcrest were to (1) take possession of the profits and (2) then withhold them. *Neither of those things have happened nor will happen prior to the resolution of this forfeiture action.*

39.     As this ruling makes clear, (1) 1169 Hillcrest was not required under the DSA to pay Palumbo until after the sale of the Property closed, and (2) the Property had not been sold as of July 20, 2016, the date when the forfeiture action was filed.

40.     On information and belief, the sale of the Property from 1169 Hillcrest to Skyview finally closed on October 25, 2016. However, distribution of these funds did not occur immediately.  Rather, the distributions were governed by a stipulation and consent judgement entered on May 26, 2017 between the United States, Neil Moffitt, and 1169 Hillcrest. The stipulation provides that "[t]he net proceeds of the sale of the [Property] shall be held in the client trust account of [1169 Hillcrest's] attorney . . . pending distribution according to the judgment." It requires Moffitt to file a Form 1040 for 2016, and provides that "sufficient funds from the IOLTA Account shall be directed to the IRS to fully pay Moffitt's tax liabilities . . . for tax years 2015 and 2016 . . . ." (*Id.*, at p. 6.)  Following the payment of these liabilities, the stipulation provides for payment of the proceeds of the sale to 1169 Hillcrest LLC and Moffitt.  (*Id.* at p. 7.) As part of this stipulation, "parties [Moffitt] agree that any dispute arising between or among the parties to this Stipulation shall be resolved by the United States District Court for the Central District of California. This Court shall retain jurisdiction to enforce the requested Judgment." (*Id.* at 8.) The Court issued an order adopting it on May 30, 2017.

- 10 -

**Palumbo Sends a Notice of Termination.**

41.     Section 8.4 of the DSA, entitled "Determination of Termination Event," provides that "[i]f either party . . . shall make a claim that a Termination Event has occurred, such party shall provide written notice to the other party . . . ."  Thereafter, the party receiving the notice "shall have the right to dispute whether a Termination Event has occurred *only by submitting such dispute to arbitration within seven days of receipt of such notice*."  The provision goes on to provide: "Failure to submit such dispute to arbitration within such seven-day period shall be deemed to constitute an irrevocable, binding admission that a Termination Event has occurred."

42.     On February 22, 2019, Palumbo sent a notice to 1169 Hillcrest and Moffitt pursuant to Section 8.4 of the DSA, alerting them that the sale of the Property to Skyview constituted a "termination event" within the meaning of that provision.  Under the terms of that provision, Moffitt then had seven days to initiate arbitration disputing that termination had occurred.  Moffitt did not do so. Accordingly, he is deemed to have made "an irrevocable, binding admission that" the sale constituted a termination event.  A copy of the Notice of Termination is attached hereto as Exhibit 3.

## FIRST CAUSE OF ACTION

### (Breach of Contract -

### Against All Defendants)

43.     Plaintiff incorporates paragraphs 1 through 42 above as though fully set forth herein.

44.     Plaintiff has performed, or been excused from performing, all or substantially all of the obligations required of him under the DSA.

45.     Section 8.1 of the DSA, entitled "Termination," provides that Palumbo's appointment may be terminated if, *inter alia*, 1169 Hillcrest "giv[es] Palumbo written notice" that "the Project and/or the Property is sold by the owner."  Section 8.3, entitled "Compensation of Palumbo on Termination," provides, in relevant part:

If Palumbo's appointment under this Agreement is terminated under Section

8.1, within 60 days after such termination, the Owner shall pay to Palumbo all amounts earned by (in accordance with Section 5.1) and owing to Palumbo under this Agreement (including any amount owing under Section 5.1), calculated *as of the date of termination,* including the Aggregate Development Fee less the aggregate of all Monthly Draws in the event this Agreement is terminated due to a sale of the Project and/or the Property.

46.     Putting these provisions of the DSA together, the DSA provides that (1) 1169 Hillcrest is required to pay Palumbo his share of the profits *after the Property is sold* but (2) Palumbo's right to receive Monthly Draws, and 1169 Hillcrest's right to receive a preferential return on its investment in the Property, terminates as of the date Palumbo's appointment as manager and developer is terminated.

47.     On February 22, 2019, Palumbo sent a notice to 1169 Hillcrest and Moffitt pursuant to Section 8.4 of the DSA, alerting them that the sale of the Property to Skyview constituted a "termination event" within the meaning of that provision. Under the terms of that provision, Moffitt then had seven days to initiate arbitration disputing that termination had occurred.  Moffitt did not do so. Accordingly, he is deemed to have made "an irrevocable, binding admission that" the sale constituted a termination event.

48.     Defendants breached the DSA by failing to compensate Plaintiff under its express terms, although repeated demand has been made.

49.     As a result of Defendants' breach of the DSA, there is now due, owing, and unpaid to Plaintiff under the DSA an amount equal to 40% of Net Profits from the sale of the Property, plus interest at the maximum rate provided by law.

50.     On information and belief, the money received by Defendant 1169 Hillcrest has been transferred to Defendants NEM 2 and Moffitt. By virtue of Defendants NEM 2 and Moffitt's wrongful retention of Palumbo Design's share of the Aggregate Development Fee, Plaintiff is entitled to an order declaring that Defendants NEM 2 and Moffitt hold said funds and any proceeds thereof and any other property acquired therewith as a constructive trustee for the benefit of Plaintiff, and should be compelled to convey these monies or properties to Plaintiff.

## SECOND CAUSE OF ACTION

- 12 -

**(Quantum Meruit Against All Defendants)**

51.     Plaintiff incorporates paragraphs 1 through 50 above as though fully set forth herein.

52.     Starting in 2014, Plaintiff performed services in connection with the Property.

53.     Defendants knew that such services were being provided to them by Plaintiff.

54.     Plaintiff's involvement in the Property was of substantial benefit to the Defendants. The fair and reasonable value of the services provided by Plaintiff to the Defendants was in excess of $2,000,000.

55.     Although Defendants have received substantial profit from the sale of the Hillcrest Property, they have refused to compensate Plaintiff for the reasonable value of his services. This unpaid amount plus interest at the maximum allowed by law on this amount is sought by Plaintiff.  Plaintiff will seek leave to amend this Complaint according to proof at the time of trial with respect to the total amount of damages and interest.

56.     On information and belief, the money received by Defendant 1169 Hillcrest has been transferred to Defendants NEM 2 and Moffitt. By virtue of Defendants NEM 2 and Moffitt's wrongful retention of Palumbo Design's share of the Aggregate Development Fee, Plaintiff is entitled to an order declaring that Defendants NEM 2 and Moffitt hold said funds and any proceeds thereof and any other property acquired therewith as a constructive trustee for the benefit of Plaintiff, and should be compelled to convey these monies or properties to Plaintiff.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.     For compensatory damages for any and all economic loss, detriment, and damage according to proof at trial, plus interest on this amount at the maximum rate allowed by law;

2.     For an order declaring that Defendants hold Plaintiff's interests in the monies obtained by them as constructive trustee for Plaintiff, for an order compelling them to convey to Plaintiff these monies, and, to the extent that all or portions of said monies have

- 13 -

been transferred to third persons with no knowledge of their wrongful acquisition/retention of such funds and for valuable consideration ("Transferred Property"), for an order requiring Defendants to pay Plaintiff an amount equal to the value of said Transferred Property, plus interest thereon;

3.     For an order compelling Defendants to account for any monies improperly obtained by them as alleged herein, and to pay the amount determined to be due Plaintiff pursuant to said accounting;

4.     For disgorgement of any money and property by which Defendants unjustly enriched themselves as a result of their unlawful conduct as alleged herein;

5.     For pre-judgment interest according to proof at trial;

6.     For costs of suit incurred herein; and

7.     For any such other and further relief as the Court may deem just and proper.

Dated: June 21, 2019

By:     _____
        Laurence M. Berman
        Berman Litigation Group
        David R. Baake
        Baake Law LLC
        Attorneys for Plaintiff Palumbo Design
        LLC

- 14 -

**FIRST AMENDED COMPLAINT**

EXHIBIT 1

# DEVELOPMENT SERVICES AGREEMENT

This Development Services Agreement (this "Agreement") is entered into as of March ___, 2014 by:

**1169 HILLCREST, LLC,** a Nevada limited liability company (the "Owner"),

and

**PALUMBO DESIGN, LLC** a California limited liability company ("Palumbo").

## RECITALS

Whereas the Owner will purchase and own and upon purchase will develop certain real estate in Beverly Hills, California for the construction of an elite high-end residence (the "Project"); and

Whereas the Owner wishes to engage Palumbo to perform the Project Services (hereinafter defined) on the terms and conditions set forth in this Agreement;

Now, therefore, in consideration of their respective agreements in this Agreement, and for other valuable consideration, the adequacy and sufficiency of which the Owner and Palumbo hereby acknowledge, the Owner and Palumbo hereby agree as follows:

1.     DEFINITIONS AND CONSTRUCTION

    1.1.   Definitions.

As used in this Agreement, the following terms have the meanings given to them in this Section 1.1.

(a)     "AAA" has the meaning set forth in Section 9.2.

(b)     "Affiliate" of any party means any Person which, directly or indirectly, controls, is controlled by, or is under common control with, the party for which an affiliation is being determined

(c)     "Agreement" has the meaning set forth in the preamble.

(d)     "Approved Plans" means the plans and specifications for the Project, approved by the Owner, as modified by the Owner from time to time.

(e)     "Arbitration" means the arbitration procedures provided in Section 9.

(f)     "Architect" means the architect or architects engaged by the Owner in connection with the planning, programming, design and construction of the Project.

(g)    "Bankruptcy Event" means the occurrence of any of the following events:

(1)    Palumbo or the Owner making a general assignment for the benefit of its creditors;

(2)    Palumbo or the Owner filing any petition or answer seeking any reorganization, liquidation, dissolution, adjustment or declaration of bankruptcy or insolvency or similar relief for itself under any present or future law relating to bankruptcy, insolvency or relief for debtors;

(3)    a court of competent jurisdiction entering an order, judgment or decree approving a petition filed against Palumbo or the Owner seeking any such reorganization, liquidation, dissolution, adjustment, declaration or similar relief for Palumbo or the Owner, and the party that is the subject of such petition acquiescing in the entry of the order, judgment or decree or the order, judgment or decree remaining unvacated and unstayed for 30 days; or

(4)    any trustee in bankruptcy, receiver, liquidator or any other officer with similar powers being appointed for Palumbo or the Owner or for all or any substantial part of its property and assets, and either Palumbo or the Owner consenting or acquiescing to such appointment or such appointment remaining unvacated and unstayed for a total of 90 days.

(h)    "Bi-Monthly Progress Reports" means a report which shall include a comparison of actual expenditures to those provided for in the Budget, and a comparison of forecasted expenditures to those provided for in the Budget.

(i)    "Budget" means, the development budget for the Project approved by the Owner, which budget shall be set forth in the form provided in Schedule 1.1(i).

(j)    "Business Day" means any day other than a Saturday, Sunday or a statutory holiday in the United States.

(k)    "Change of Control" shall be deemed to have occurred if:

(1)    any Person or group of Persons acting in concert, other than Michael Palumbo acquires or becomes entitled to fifty percent (50%) or more of the combined voting power of the Persons entitled to elect the directors (or comparable positions) of Palumbo; or

(2)    there is otherwise a change in the power, directly or indirectly, to direct or cause the direction of the management and policies of Palumbo, whether by contract or otherwise, and either alone or in conjunction with others.

(l)    "Conceptual Budget and Schedule" means the conceptual budget and schedule for the Project that has been approved by the Owner as at the date of this Agreement, and is attached as Schedule 1.1(l).

(m)    "Construction Loan" means any construction loan to be made to the Owner for the purpose of financing the costs of the Project.

(n)     "Consultant" means any Person (other than Palumbo) engaged by the Owner to provide architectural, engineering, design, structural, mechanical, electrical, landscaping, legal, marketing and sales, accounting or other consulting services in connection with the planning, approvals, programming, permitting, design, sales or marketing of the Project.

(o)     "Contingency Reserve" means the amount specifically designated in the Budget as a contingency or a reserve, including any amount reallocated to such contingency or reserve as approved by the Owner.

(p)     "Default" means any material breach or default under this Agreement, if such material breach or default continues uncured for a period of 30 days after the breaching or defaulting party receives written notice of the nature of such breach or default; provided, however, if such material breach or default can be cured but cannot, with diligence, be cured within such 30-day period, then such material breach or default shall not constitute a Default if the breaching or defaulting party shall promptly commence and at all times thereafter diligently pursue the cure of such material breach or default and such material breach or default shall be cured within 60 days after the breaching or defaulting party receives such notice.

(q)     "Development Approvals" means all approvals and permits from any federal, state, municipal or other governmental or regulatory authority required under applicable laws and regulations for the planning, programming, permitting, design, construction, development and use of the Project.

(r)     "Development Schedule" means the schedule for development of the Project approved by the Owner, and as may be amended from time to time by the Owner.

(s)     "Disbursement Account" means an account of the Owner into which the Owner shall deposit or transfer, in accordance with Section 3.5, any sums payable in connection with the Project Services.

(t)     "Expedited Arbitration" has the meaning set forth in Section 9.2.

(u)     "General Contractor" means the general contractor for the Project selected by Owner.

(v)     "Lender" means any party making Project Financing available to the Owner.

(w)     "Owner" has the meaning set forth in the preamble.

(x)     "Palumbo" has the meaning set forth in the preamble.

(y)     "Performance Standard" means the standard of performance maintained by Palumbo, which shall be in a manner consistent with the care, skill, prudence and diligence that a prudent Person acting in a like capacity and possessing expertise with respect to such matters would use in the conduct of an enterprise of like character and with like aims.

(z)     "Person" includes any individual, corporation, corporate body, partnership, limited partnership, limited liability company, joint venture, trust, estate, unincorporated association or other entity or any government or governmental or regulatory authority however designated or constituted.

(aa)     "Project Costs" means the actual costs incurred by Owner in connection with the Project, excluding (1) any expenditures the cost of which is covered by funds from a Contingency Reserve (whether through reallocation or otherwise), (2) any amount payable for a particular line item in excess of the amount provided for that item in the Approved Budget and (3) any costs incurred by Palumbo in providing Development Services.

(bb)     "Project Financing" means any loan, line of credit or other credit facility of the Owner that finances any Project Costs and any other fees, costs, expenses, indebtedness and other monetary obligations payable, incurred or assumed by the Owner in connection with the acquisition, planning, programming, permitting, design, construction and development of the Property.

(cc)     "Project Services" has the meaning set forth in Section 2.1.

(dd)     "Project" means the construction of an elite high-end residence on the Property in accordance with the Plans.

(ee)     "Property" means the real property and premises located at 1169 Hillcrest Road, Beverly Hills, California 90210.

(ff)     "Sale Proceeds" means the gross selling price of the Property.

(gg)     "Services Contractor" means any Person engaged by or on behalf of the Owner to perform services relating to the Project, including the provision of materials, supplies, machinery, plant, equipment, fixtures, furnishings, inventory or any other fixed property or chattels with respect to the Project, but Services Contractor does not include Palumbo, the General Contractor or Trade Contractors.

(hh)     "Termination Event" has the meaning set forth in Section 8.1.

(ii)     "Trade Contractor" means any person engaged directly by the General Contractor to perform construction relating to the Project, including the provision of materials, supplies, machinery, plant, equipment, fixtures, furnishings, inventory or any other fixed property or chattels with respect to the development and construction of the Project.

1.2.     Interpretation of Certain Terms.

(a)     Unless otherwise specified, all references to "Articles," "Sections," "subsections" and "Schedules" shall be deemed to refer to the designated articles, sections, subsections, schedules and other subdivisions of this Agreement;

(b)     The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular article, section, subsection, Schedule or other subdivision of this Agreement.

(c)     The word "including" shall not be construed to limit any general statement, term or matter to the specific item or matter set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to") is used in connection with such word, but rather shall be construed to refer to all other items or matters that could reasonably fall within the scope of such general statement, term or matter.

1.3.    Currency.

All references to currency are deemed to mean lawful money of the United States of America, and all amounts to be paid or calculated pursuant to this Agreement are to be paid or calculated in lawful money of the United States of America.

1.4.    Gender and Number.

As the context may require, as used in this Agreement, any singular term shall be deemed to include and refer to any plural version of such term; and any masculine term shall be deemed to include and refer to any feminine or neuter version of such term.

1.5.    Headings.

The division of this Agreement into articles and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

1.6.    Governing Law.

This Agreement shall be governed by, and construed in accordance with, the laws of California, without giving effect to that State's principles of conflicts of law.

1.7.    Schedules.

The following Schedules are attached to, and form part of, this Agreement:

| | |
|---|---|
| Schedule 1.1(i) | Form of Budget |
| Schedule 1.1(l) | Conceptual Budget and Schedule |
| Schedule 5.1 | Development Fee |
| Schedule 10.2 | Assignment and Assumption Agreement |

2.    APPOINTMENT OF PALUMBO

2.1.    Appointment.

The Owner hereby appoints Palumbo to manage and oversee the planning, approvals, programming, permitting, design, construction, and development of the Project (the "Project Services") and, in connection therewith, to perform the services hereinafter specified, on the terms and conditions set forth in this Agreement. Palumbo hereby accepts such appointment and hereby agrees to perform such services and its other duties and responsibilities under this Agreement, subject to, and in accordance with, the Performance Standard.

2.2.    Development Sequencing.

The Project shall be developed, as follows:

(a)    Palumbo has prepared, and the Owner has approved, the Conceptual Budget and Schedule for the Project, as provided in Schedule 1.1(l). The Owner and Palumbo acknowledge that as the development process proceeds, Palumbo has prepared or shall prepare, for the Owner's approval, the Budget, and the Development Schedule for the Project; and

(b)    prior to construction of any component of the Project, Palumbo shall be responsible to secure for the Owner all Development Approvals.

2.3.    Effective Date.

The effective date of this Agreement shall be the date first written above.

2.4.    Reimbursement of Deposit Escrow.

Upon Owner's purchase of the Property, Owner shall pay to Palumbo $150,000.00 to reimburse Palumbo for Palumbo's payment of the escrow deposit for the purchase of the Property.

2.5.    Limitation on Authority.

Palumbo shall have no right or authority under this Agreement, express or implied, to commit or otherwise obligate the Owner in any manner whatsoever except to the extent specified in this Agreement or specifically authorized in writing by the Owner.

2.6.    Independent Contractor.

Palumbo and the Owner expressly disclaim any intention to create a partnership or joint venture; nothing in this Agreement shall constitute Palumbo and the Owner as partners or joint venturers; and neither Palumbo nor the Owner shall assert, for any purpose, that a partnership or joint venture exists between them hereunder. The services to be performed by Palumbo under this Agreement shall be performed by Palumbo as an independent contractor and not as agent or in any other way as a representative of the Owner.

2.7.    Reliance on Owner's Representatives.

In all dealings with the Owner and in performing its duties, responsibilities and services under this Agreement, Palumbo shall be entitled to rely on any instruction, statement or approval from any authorized representative of the Owner from time to time. At Palumbo's request, the Owner shall provide to Palumbo a list of the Owner's authorized representatives and thereafter amend such list from time to time as necessary to reflect any changes in such authorized representatives.

3.    SERVICES

3.1.    Development Services.

Subject to the other terms of this Agreement, including the terms of Sections 2.4, 4.1 and 4.4, the Owner hereby authorizes Palumbo, and Palumbo hereby agrees, to perform the Project Services in accordance with the Performance Standard, including:

(a)    negotiating (for execution by the Owner) and managing and directing the performance of, all contracts between the Owner and all Consultants, Services Contractors and other third parties (other than Trade Contractors) with respect to the Project Services and coordinating the activities of such Consultants, Services Contractors and other third parties;

(b)    coordinating and managing the preparation of, and any changes to, required plans for the Project, including but not limited to: architectural and engineering plans, and after Palumbo is satisfied with the form and content of any and all such plans and specifications, submitting such plans and specifications to the Owner and causing such plans and specifications to be revised as required by the Owner until they are approved by the Owner and designated as the Approved Plans.

(c)    preparing the budgets for the development of the Project and submitting each budget to the Owner for its review and approval prior to the commencement of any predevelopment or construction activities on the Project;

(d)    preparing any amendments to the Budget and submitting each amendment to the Owner for its review and approval, prior to the expenditure of any amounts provided in such amendment;

(e)    on behalf of the Owner,

(1) applying for and pursuing all Development Approvals for the Project,

(2) negotiating and, subject to the approval of the Owner, concluding any required agreement with any governmental authority with respect to those Development Approvals, and

(3) managing and overseeing compliance with the terms and conditions of any such agreement and any Development Approvals;

(f) (1) preparing a proposed master schedule of the sequence and timing of basic decisions, design time, documentation, contract awards and construction activities required to develop and construct the Project,

(2) submitting such schedules to the Owner for approval and designation as the Development Schedule and

(3) revising and updating for the Owner's approval such Development Schedule as the planning, programming, approvals, permitting, design, construction and development proceeds;

(g) using commercially reasonable efforts to cause the Project Services to proceed in accordance with the Development Schedule, Development Approvals, and to proceed in accordance with the Development Approvals and the Plans;

(h) on behalf of the Owner, procuring and maintaining insurance coverage for the Owner, the Property and the Project in accordance with Section 3.6.

(i) monitoring the progress of the construction of the Project, and ensuring that the construction of the Project is being carried out in accordance with the Development Approvals, the Development Schedule, the Approved Plans and the Budget or, in the event construction is not being so carried out in any material respect, promptly notifying the appropriate Persons and the Owner, and overseeing the management and the development of the Project by:

(1) establishing and implementing appropriate administrative, financial and cost controls for the development of the Project and making suggestions or requests for specific design improvements, cost savings and efficiencies;

(2) identifying, in consultation with the Services Contractors, Consultants and/or Trade Contractors to participate in the construction of the Project, which Services Contractors, Consultants and/or Trade Contractors are reasonably experienced and qualified, with adequate capacity and resources, to carry out their duties and obligations in a timely manner, and, if applicable, preparing all required tender documents and reviewing all tenders;

(3) implementing, in accordance with this Agreement, any decisions of the Owner made in connection with the development and construction of the Project or any policies and procedures of the Owner relating to such development and construction and instructing the General Contractor where such decisions, policies or procedures relate to construction matters;

(4) obtaining and using commercially reasonable efforts to maintain in full force and effect all usual and normal warranties (excluding those provided by Trade Contractors) with respect to work done or materials supplied to the Owner in connection with the Project and coordinating and managing rectification of all deficiencies and administration of all warranties in accordance, where applicable, with the requirements of any new home warranty legislation;

(5)    (i)    if applicable, assist the Owner with obtaining Project Financing;

(i)    execute any documents reasonable requested by any Lender including, without limitation, an assignment of this Agreement; and

(ii)    preparing and submitting to the Owner periodic draw requests under the Project Financing containing such information as is required by the Owner or the Lender;

(6)    reviewing applications for payment submitted by the General Contractor, or any Services Contractor or Consultant and preparing documentation for all requests for payments from the Owner, in form and content sufficient to permit the Owner to determine the appropriateness of such payments;

(7)    preparing and submitting to the Owner (and any other parties designated by the Owner) the Bi-Monthly Progress Reports;

(8)    when appropriate, obtaining certification of substantial completion from the Architect stating that construction completion has occurred;

(9)    coordinating efforts by all appropriate parties to complete all warranty work and ensuring the quality of such warranty work;

(10)    promptly notifying the Owner of (i) any actual or anticipated material change in the Development Schedule of which Palumbo becomes aware, (ii) actual or anticipated material increases in the Budget of which Palumbo becomes aware, (iii) any material breaches or defaults under this Agreement of which Palumbo becomes aware, and (iv) any other circumstances of which Palumbo becomes aware which may materially impact the ability of the Owner to construct the Project in accordance, in all material respects, with the Budget, the Approved Plans, the Development Approvals and the Development Schedule;

(11)    assisting the Owner with respect to negotiations with all applicable utility companies, whether governmental or otherwise, for the installation of all applicable utility services to the Project on a timely basis, with the Owner bearing the cost of all required utility deposits and costs of installation; and

(12)    performing and administering any and all other services and responsibilities with respect to the Project which the Owner requests Palumbo to perform and which are within the general scope of the services described in this Section 3;

(j)    subject to the terms of Section 3.4, to the extent specified in the Budget and provided that funds are available from the Owner, and subject to the satisfactory review and approval by Palumbo and the Owner of all supporting documentation and applications for payments submitted by any vendor, paying the following amounts, on or before the date when such payments are due, for and on behalf of, and in the name of, the Owner: